Filed 3/7/14  In re Miley C. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re MILEY C., a Person Coming Under the Juvenile Court Law. | B248455 |
| | (Los Angeles County Super. Ct. No. CK89684) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| MARIO C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Terry T. Truong, Juvenile Court Referee.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

Mario C. (father) appeals from juvenile court jurisdictional orders establishing dependency jurisdiction over his infant daughter, Miley, pursuant to Welfare and Institutions Code section 300.[1] Father also challenges the juvenile court's dispositional order removing Miley from his custody. Father contends that substantial evidence does not support the juvenile court's jurisdictional findings as to him, and that the court erred in failing to place Miley in his custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**Family information**

Miley was born in January 2013. Miley's mother, Michelle C. (mother) lived in Pomona, and father lived in Azusa.[2] Mother and father married in December 2010 and separated in June 2012.

**Prepetition events**

The Los Angeles County Department of Children and Family Services (DCFS) received a referral in January 2013, alleging that mother had given birth to Miley the day before and that both mother and the infant had tested positive for methamphetamine. Mother admitted to having a history with DCFS and having her older children removed from her care and placed with their biological fathers. The reporting party had spoken with father, who stated that he was not living with mother because she had drug problems and lived in an unhealthy environment. Father indicated he was willing and able to have custody of Miley.

A DCFS social worker responded to the referral by traveling to the hospital to meet with the parents and the hospital social worker. Mother stated she was legally married to father, but they were not currently living together due to domestic violence.

---

[1]    All further statutory references are to the Welfare & Institutions Code.

[2]    Mother is not a party to this appeal.

Mother affirmed that she had two other children living with their respective fathers.[3] Mother admitted she used methamphetamine not long before giving birth to Miley. She also admitted to having tested positive for methamphetamine earlier in January 2013, when she was admitted to the hospital for false contractions.

Mother described domestic violence between father and herself. On New Year's Eve 2012, she and father were arrested because of their failure to complete court-ordered domestic violence classes. Mother explained that the neighbors had called 911 because father hit her on the back. Father was arrested. Although mother sustained injuries, she did not press charges against father despite police request.

Mother stated she was currently living in a motel with maternal grandmother (MGM) since she no longer lived with father. However, she indicated that MGM did not want her to return to the motel and she had nowhere else to live. The social worker provided mother with resources for shelters. Throughout the social worker's hour and a half visit, mother did not request to hold the baby. Father held the baby the entire time.

The social worker also interviewed father. Father denied knowledge of mother's use of drugs. He said mother had a history of drug use but he only found out about the current use of drugs when he came to the hospital to see mother and Miley. Father stated that mother's drug use was one of the reasons he separated from mother after a couple of years of marriage. Father admitted that there had been an allegation of domestic violence at a time when he was arrested for "not really hitting" mother. He explained that he and mother had been arguing and he slapped her on the back, but the neighbor contacted law enforcement alleging that he had hit her on the head. Father denied present drug use but admitted to using drugs about five years before. Father denied any mental health issues. He expressed a desire to care for his child when she was released from the hospital.

---

[3] Mother's two older children are Noah W., who lives with his father in Barstow, California, and R.W., who lives with her father in Lancaster, California. Mother does not have contact with Noah. She claimed to be in touch with R. but could not provide the social worker with the child's telephone number.

Father told the social worker that he resided in a two bedroom apartment with a cousin. He agreed to have the home assessed and to have all adults living in the home live-scanned. Father expressed willingness to comply with all the procedures implemented by DCFS. He was affectionate and caring towards the baby, and had her in his arms the entire time that the social worker was speaking to him.

The following day, the hospital social worker informed the DCFS social worker that mother was disengaged from the child. Mother would not change the baby's diaper or feed her. Father did all the diaper changing, feeding, and was affectionate towards the baby. The baby was separated from mother due to safety concerns. The social worker visited father's home and completed a home inspection. Father lived in an apartment with two other relatives in Azusa. The home was relatively clean but father was sleeping in the living room. The social worker concluded that there would be no room for Miley; therefore the home did not appear suitable.

On January 29, 2013, while Miley was still at the hospital, DCFS filed an application requesting authorization for removal. The order authorizing removal was signed the same day. The social worker served mother, father, and the hospital with the removal order. On January 30, 2013, the baby was placed in a foster home.

**Section 300 petition and detention**

DCFS filed a section 300 petition on February 1, 2013, containing allegations against mother and father pursuant to section 300, subdivisions (b) and (j) regarding mother's substance abuse and the domestic violence between mother and father. DCFS filed a detention report on the same date.

Attached to the detention report was a police report authored by Pomona Police Department Officer T. Ugarte regarding a September 11, 2011 child endangerment incident involving R., who was four years old at the time. According to the police report, Officer Ugarte was dispatched to the home on September 11, 2011, by a social worker who was already at the home. The reporting party told the social worker that mother often left R. home alone. Officer Ugarte reported that the condition of the home was "very poor," with trash, miscellaneous bottles, and numerous piles of paperwork strewn

4

throughout the apartment floor. Additionally, the home did not have a refrigerator or any food. When asked how long the home had been in that condition, mother responded "for a long time." Mother stated she had no food in the home and she depended on various people to bring food to her.

Mother admitted to smoking methamphetamine every three to four days. Officer Ugarte also reported noticing a large hole in the bedroom door. Mother said she made this hole when she was angry, and that when father used to stay at the apartment, "they would periodically have violent fights and somehow holes would end up in various places inside of the apartment." Officer Ugarte observed the holes in the walls. Mother said father did not live at the apartment anymore and denied any current domestic violence issues. Officer Ugarte mentioned to another police officer that he did not want the child left with mother because the current situation was unsafe. Mother responded, "Yeah I don't think it's a good idea, it gets really crazy around here." Officer Ugarte opined that R. was a victim of child endangerment and arrested mother, and DCFS took R. into protective custody.

At the February 1, 2013 detention hearing the juvenile court found that there existed a prima facie case for detaining Miley. Father appeared and was appointed counsel. The court found father to be the presumed father of Miley. Father's counsel requested that Miley be released to father. Father's counsel argued that father was unaware of mother's drug use, lived in a separate location from mother, and had ample means to support the child. Father's counsel informed the court that father intended to submit a request for restraining order against mother. Because father's counsel did not bring father's request for a restraining order to the hearing, the court granted a "stay-away order." Miley's counsel requested that the court detain Miley from father, given the allegations in the section 300 petition and mother's statements regarding domestic violence. The court made orders detaining Miley from the parents and permitting monitored visits for the parents.

On February 8, 2013, the juvenile court conducted an arraignment hearing for mother. Mother appeared with counsel. The court ordered the parents to remain at least

100 feet away from one another, and not to contact one another by telephone, email, or social media. The court ordered Miley detained in the home of her paternal cousins.

**Jurisdiction/disposition report**

The jurisdiction/disposition report, filed March 11, 2013, detailed prior DCFS referrals regarding the family. There were five allegations of general neglect involving mother's son Noah and daughter R. between 2005 and 2011 which were either inconclusive or unfounded. In September 2011, allegations against mother and father of physical and emotional abuse as to R. were substantiated and resulted in the filing of a section 300 petition. The allegations against mother and father included a history of domestic violence in the child's presence. Specifically, father struck mother's arm, inflicting bruises. The disposition date of the case was January 30, 2011, at which time R. was released to her father, Leonard W. On May 30, 2012, the juvenile court terminated jurisdiction over the case with a family law order granting Leonard W. full physical custody.

Both parents had criminal histories. In September 2011 and October 2011, mother was charged with kidnapping, possessing controlled substance paraphernalia, and willful cruelty to a child. The kidnapping charge arose when mother was arrested after arriving at R.'s school under the influence of drugs and attempting to take another child from the school, thinking it was her child. Mother was sentenced to 30 days in jail, four years probation, and a fine. Mother stated that she was no longer on probation and had no further court appearances.

Father's criminal history included an incident in June 1998 for which father received three years' probation for vandalism and possessing/selling a switchblade knife. In January 2012, father was charged with infliction of corporal injury on a spouse. According to father, he was placed on summary probation for three years and was ordered to complete a 52-week domestic violence class. Father reported that he started attending the domestic violence classes in 2012, however, he stopped attending because he could not afford to pay for them. Father also claimed that he recently enrolled in

6

domestic violence classes and had completed three classes so far. Father's next scheduled criminal court appearance was May 2, 2013, for a progress report.

Miley's caretakers indicated that father was visiting regularly with the baby. Mother, however, had no contact with Miley.

On March 8, 2013, DCFS interviewed the parents. Mother acknowledged that she had "messed up" by not completing her programs to reunite with R. Regarding the physical altercations with father, she stated that they were "nothing but stupidity on both parts and it was not right. There were holes in the walls where we lived at that time. We both kicked the doors." Mother denied that the physical altercations were in front of R., and claimed she did not recall hitting father. However, mother stated, "I do remember the holes in the wall and we both kicked doors. We were going through hard times. He was not working. I was injured and on disability. This was a one-time altercation."

Father admitted punching holes in the walls when he lived with mother, because he was "frustrated and angry about her drug use." However, he claimed that R. was not present at the time. He stated: "I would hold [mother's] arms when we would get into it to prevent her from hitting me. She would hit me, bite me, and sock me. If she received a bruise, it was from me holding her arms to keep her from attacking me." Father denied ever hitting mother.

Father reported he had known mother for many years, and they were married in December 2010. He found out that mother had a drug problem about two years after the marriage. She was free from drugs for a time and then started using drugs again when she was about six months pregnant with Miley. Father and mother were living together from about October 2010 through June 2012, and during that time, they used methamphetamines together. The parents stayed together for the first six months of mother's pregnancy. Father stopped using drugs, but mother did not. He moved out of the home in June 2012 because of his altercations with mother. Father claimed he no longer used drugs.

Father reported that mother came to his home on January 4, 2013, so they could go together to her medical appointment. Upon arriving at his home, she began having light

7

contractions so he called an ambulance. While they were waiting for the ambulance, mother admitted that she "got high" the night before. Because of this, father suspected that the baby may have problems from the drugs but he did not know what to do. Father said that he felt like he was being punished for something mother did. He admitted that he "messed up" when he failed to complete his domestic violence classes, but claimed that he was in classes at present. Father provided proof of enrollment and attendance at three sessions.

DCFS opined that based on its investigative findings to date, continued detention from the care of the parents was in the best interests of the child. DCFS cited mother's "unresolved substance abuse issues, limited resources/family support, and a history of domestic violence in her relationship with her husband." As to father, DCFS indicated that he had "unresolved criminal issues which is a result of domestic violence with the mother and reportedly past substance abuse." DCFS recommended that the juvenile court sustain the petition as alleged, declare Miley a dependent of the court, and order family reunification services and monitored visits for the parents.

**Last minute information for the court**

In a last minute information for the court filed on March 21, 2013, DCFS attached a copy of a police report from the Pasadena Police Department regarding a domestic violence incident between the parents on January 1, 2012. The report revealed that father was arrested for placing mother in a headlock, which caused mother to sustain bruises and redness to her left bicep. Officer Lee was dispatched to the home at 2:25 p.m. Mother reported that she and father had gotten into a fight. Mother added that the parents were going through marital problems because of her methamphetamine addiction. For the past two months, mother had been living apart from father because of her addiction. However, as of the preceding day, she had voluntarily withdrawn from the drug program in which she had been participating. Mother had come to the home to remove her belongings. Because she had a lot of things, she asked father to help her move to MGM's apartment. As the parents left the building with several bags, father complained that he

8

did not want to help mother move. Mother responded "I'll get another guy to help then." Father "snapped" and grabbed her left bicep.

Officer Lee interviewed a witness, Kevin S., who was standing outside his residence when he heard the parents arguing. According to Kevin, father placed mother in a headlock and slapped her face twice. After he shouted "hey" at father, father quickly released mother. Based on statements from mother and Kevin, father was arrested, booked for domestic violence, and transported to jail.

At the jail, Officer Lee asked father what had happened. According to father, the argument between him and mother started when father told mother he did not want her to leave the drug rehabilitation program. Father acknowledged that he grabbed her right bicep in an attempt to get her back into the residence. When mother turned her body away from father to get away, father placed her in a headlock with his left arm and then rubbed the top of her head with his right knuckles. Father claimed he was "playing around."

The parents were also tested for drugs on March 8, 2013. Mother tested positive for methamphetamine. Father tested negative for drugs and alcohol.

Father filed a petition for dissolution of marriage on March 22, 2013. He enrolled in a parenting education and support group on March 18, 2013, and had attended 1 out of 20 sessions.

**Adjudication**

The juvenile court adjudicated the petition on March 25, 2013. The parents appeared with counsel. Father requested the counts against him be dismissed. Father's counsel argued that the alleged events involving altercations in front of R. took place over two years before. Additionally, father argued that there was no evidence in any of the materials that the physical altercations took place in R.'s presence, that father was not in attendance at those hearings, and that he was unaware of the allegations that he had hit mother in front of a minor. Father also argued that there was no nexus or risk of harm or detriment to Miley from that previous alleged conduct.

9

Mother's counsel joined with father's arguments. Mother's counsel stated: "I do agree with father's counsel in that the parents do not present a current risk of having any altercations with each other as they are no longer together and father has filed for dissolution of marriage."

Miley's counsel asked that the court sustain the three counts against both parents. Miley's counsel stated:

"With regards to the past domestic violence between the parents, even though Miley was not born at the time, it doesn't seem that either parent has resolved any of the issues that led to the conflict that they had a couple years ago. I do think there is ongoing risk to Miley if she were returned to either of the parents' care."

County counsel also requested that the court sustain the petition as pled.

The juvenile court sustained counts b-1 and b-2 against mother. Count j-1 was sustained against both parents. Count j-1 read:

"The child, [Miley's] mother [Michelle] and father [Mario] have a history of engaging in violent altercations in the presence of the child's sibling, [R.]. On a prior occasion, the father struck the mother's arm inflicting bruises to the mother's arm. On a prior occasion, the father punched a hole in the door of the sibling's home. On a prior occasion, the mother kicked and punched the door in the sibling's home. The child's sibling, [R.] was a dependent of the Juvenile Court. Such violent conduct on the part of the parents places the child at risk of harm."

The court declared Miley a dependent of the court under section 300, subdivisions (b) and (j). Pursuant to section 361, subdivision (b), the court found by clear and convincing evidence that there was a substantial danger to the baby if she were returned home to the parents and that there were no reasonable means to protect the child without removal from the parents' custody.[4]

---

[4]     While the minute order cites section 361, subdivision (b), the juvenile court discussed the substantial danger standard set forth in section 361, subdivision (c)(1). We therefore assume that the court's reference to subdivision (b) was a typographical error, and that the court meant to cite section 361, subdivision (c)(1).

The court then inquired as to whether the child was living with both parents at the time of removal. Miley's counsel informed the court that the child was taken from the hospital and placed in suitable placement. The court then stated, "So this is removal from the mother."

The court ordered reunification services for both parents. Father was ordered to complete parenting and individual counseling given that he had already been ordered by the criminal court to complete a 52-week domestic violence program. The parents' visitation was ordered supervised.

Father's counsel's request that the visits could be as often as they could be scheduled, was granted. Father's counsel also requested unmonitored visits for father. The court stated: "No. He needs to make some progress in domestic violence in his counseling program and individual counseling programs."

Father's counsel did not make any objections to the dispositional orders, nor did he request custody of Miley on father's behalf.

On March 25, 2013, father filed a notice of appeal.

## DISCUSSION

### I. Standard of review

We review the juvenile court's jurisdictional findings under the substantial evidence standard. (*In re David M.* (2005) 134 Cal.App.4th 822, 829 (*David M.*); *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Under this standard, we review the record to determine whether there is any reasonable, credible, and solid evidence to support the juvenile court's conclusions. We resolve all conflicts in the evidence, and make all reasonable inferences from the evidence, in support of the court's orders. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 (*Savannah M.*).)

We also review the juvenile court's decision to remove a child from a parent's custody under the substantial evidence standard. (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038 ["The record in the case . . . discloses that Amos was removed from his mother's custody and placed in a foster home. . . . [T]he correct standard of proof to be applied at the dispositional hearing in such a case is clear and convincing evidence.

11

However, on appeal, the substantial evidence test applies to determine the existence of the clear and convincing standard of proof, the same as in other cases"].)

## II.  Justiciability

In this appeal, father does not challenge the sustained allegations as to mother.  He only challenges the findings and orders as to him.  Father acknowledges that some courts, including this court, have refused to address specific jurisdictional findings based on mootness and non-justiciability grounds in cases such as this where some, but not all, of the jurisdictional findings are challenged.  (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979 ["As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 ["it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child"].)  "[A]n appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence.  [Citations.]"  (*In re I.A., supra*, at p. 1492.)

Father argues that in this case, there are valid reasons for addressing the merits of his arguments.  In support of his position, father cites *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*).  In *Drake M.*, the father challenged a single jurisdictional finding against him involving his use of medical marijuana.  DCFS argued that the unchallenged findings as to mother would continue to support jurisdiction, therefore father's appeal was nonjusticiable.  (*Id.* at p. 762.)  The *Drake M.* court decided to consider the merits of father's appeal, stating:

> "Here, the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent.  Such a distinction may have far-reaching implications with respect to future dependency proceedings in this case and father's parental rights.  Thus, although dependency jurisdiction over Drake will remain in place because the findings based on mother's conduct are unchallenged, we will review father's appeal on the merits."

(*Drake M., supra*, 211 Cal.App.4th at p. 763.)

Father argues that the jurisdictional findings as to him could have an effect on current or future dependency proceedings. The outcome of the appeal could mean the difference between father being an "offending" versus a "non-offending" parent. In addition, the findings serve as the basis for dispositional orders that are also challenged on appeal. (*Drake M., supra*, 211 Cal.App.4th at pp. 762-763 [suggesting that the Court of Appeal should reach the merits of a challenge to a jurisdictional finding when the finding serves as the basis for dispositional orders that are also challenged on appeal].)

Here, as in *Drake M.*, the jurisdictional findings serve as the basis for a challenged dispositional order and may be prejudicial in the current or future dependency proceedings. We agree with father that the outcome of the appeal could mean the difference between father being an "offending" rather than a "non-offending" parent. (See *Drake M., supra*, 211 Cal.App.4th at pp. 762-763.) We therefore address father's contentions on the merits.[5]

### III. Substantial evidence supports the true finding under section 300, subdivision (j)

Section 300, subdivision (j) provides a basis for jurisdiction if the child's sibling has been abused or neglected as defined in subdivisions (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. In making a finding under section 300, subdivision (j), the court is directed to "consider the circumstances surrounding the abuse or neglect of the sibling, the age

---

[5] The First Appellate District has taken a different position. In *In re I.A.*, Division One wrote: "Father asks us to review the evidentiary support only for the juvenile court's jurisdictional findings involving *his* conduct. Because he does not challenge the jurisdictional findings involving Mother's drug abuse, however, any decision we might render on the allegations involving Father will not result in a reversal of the court's order asserting jurisdiction. The juvenile court will still be entitled to assert jurisdiction over the minor on the basis of the unchallenged allegations. Further, the court will still be permitted to exercise personal jurisdiction over Father and adjudicate his parental rights, if any, since that jurisdiction is derivative of the court's jurisdiction over the minor and is unrelated to Father's role in creating the conditions justifying the court's assertion of dependency jurisdiction." (*In re I.A., supra*, 201 Cal.App.4th at p. 1492.) We choose to follow the analysis set forth in *Drake M.*

13

and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).)

The juvenile court had evidence before it that allegations against father arising from events in September 2011 had been sustained in a prior dependency proceeding involving Miley's half sister, R. Specifically, the sustained allegations stated that father and mother had a history of engaging in violent altercations in the child's presence, and that father had inflicted bruises on mother's arm and had kicked and punched a door in the child's home. The dependency matter involving R. terminated with a family law order that granted R.'s father full physical custody.

In addition, the court had before it a police report dated January 1, 2012, when an officer was dispatched to respond to allegations that father had hit mother. Mother sustained bruises to her left bicep after father grabbed her. A witness indicated that father put mother in a head lock and slapped her twice. Father was arrested for this incident. Father also admitted that he had been ordered to complete a 52 week domestic violence class as a result of this arrest, but that he failed to do so.

This evidence was sufficient to support the juvenile court's decision to sustain the allegations in count j-1. Miley's half-sibling had been a victim of abuse, including violence between mother and father in the child's presence. In addition, there was evidence that the domestic violence issues that caused the removal of R. from mother and father were unresolved. The domestic violence continued, resulting in father's arrest on New Year's Day 2012. Even after that arrest, father failed to properly address the domestic violence issues. Specifically, he failed to complete a court ordered domestic violence program. Under the circumstances, the juvenile court had sufficient evidence that Miley would be subjected to the same risk of domestic violence that caused R.'s removal from the home.

Father sets forth several arguments as to why the evidence before the juvenile court was insufficient. Father cites *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, for the proposition that the circumstances at the time of the hearing must be such that the child

14

will be at substantial risk of harm. Father argues that physical violence between a child's parents support the exercise of jurisdiction only if the evidence shows that the harm is likely to continue and that it places the child directly at risk of harm. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 (*Daisy H.*).)

In *Daisy H.*, the mother informed the social worker that seven years before the petition had been filed, father pulled her hair and choked her. (*Daisy H., supra*, 192 Cal.App.4th at p. 717.) The Court of Appeal determined that the evidence was insufficient to show that past or present domestic violence between the parents placed the children at a current risk of substantial harm. The parents had separated, there was no evidence that the children were exposed to past violence and there was no evidence of any ongoing violence. The children, who were 9 and 13, indicated that they had never witnessed physical violence between their parents. (*Ibid.*)

Here, in contrast, the parents' physical violence in the home led DCFS to file a dependency petition on behalf of Miley's sibling, R. The allegations against mother and father were sustained, and they were ordered to complete domestic violence programs. Neither parent completed the required program, and the domestic violence between them continued, as evidenced by the January 1, 2012 incident.

Father also relies on *David M*. There, the Court of Appeal concluded that the Orange County Social Services Agency did not meet its burden of proving failure to protect and the abuse of sibling pursuant to section 300, subdivisions (b) and (j) because there was no substantial risk of serious harm to the two children at issue at the time of the jurisdiction hearing. The court stated that mother's mental and substance abuse problems and father's mental health problems were never tied to any actual harm to the children or a substantial risk of such harm. (*David M., supra*, 134 Cal.App.4th at p. 830.) Regarding a previous petition which had been filed on behalf of an older sibling, the court noted that the juvenile court failed to take judicial notice of the record in that case. The court queried, "What services were offered, and what were the circumstances of mother's apparent failure to fulfill her case plan and reunify with Aaron? We cannot tell from the

record before us, and we do not see how the juvenile court could have done so, either." (*Id.* at p. 832.)

Similarly, in *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 566 (*Ricardo L.*), the Court of Appeal discussed a jurisdictional challenge under section 300, subdivision (j) and noted that the record of the prior dependency proceeding involving Ricardo's older siblings was not admitted to evidence. The Court of Appeal noted that the social services department was relying on the fact that the siblings had been under the protection of the juvenile court for many months without resolution. However, there was no evidence of the reasons behind the dependency of the siblings, no evidence of the substance abuse histories of the parents, and no history of their neglect or failure to provide medical treatment or shelter to those siblings. The court concluded, "Without the history of abuse and neglect, it is nearly impossible to determine whether Ricardo, Jr. is at risk of suffering from the same abuse and neglect." (*Id.* at p. 567.)

Father argues that as in *David M.* and *Ricardo L.*, R.'s case file was not attached to the petition or reports in this case, and the juvenile court did not reference this item. The juvenile court never took judicial notice of R.'s case file nor did it state that it had considered the file.

Father cites no law mandating that the juvenile court take judicial notice of the entire sibling case file as a prerequisite to sustaining a jurisdictional finding under section 300, subdivision (j). Here, there was ample evidence before the juvenile court of the problems which led to R.'s detention and removal from mother and father. There was evidence of the specific allegations against mother and father. Mother admitted that she had "messed up" by not completing her programs to reunite with R., and father admitted to failing to complete a court ordered domestic violence program. In addition, a police report revealed the continuing domestic violence between the parents even after R. was removed from their custody.[6]

---

[6]     Mother has noted that the sustained petition, count j-1, does not refer to the more recent incident of domestic violence between mother and father, which occurred January 1, 2012, prior to Miley's birth. Mother has also stated that there is no evidence that this

16

DCFS's reports, which contained hearsay evidence concerning the previous dependency proceeding involving R., constituted sufficient evidence to support a finding of jurisdiction under section 300, subdivision (j). (§ 355, subd. (b) ["A social study prepared by the petitioning agency, and hearsay contained within it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based"].) The juvenile court was not required to take judicial notice of the case file in the matter involving Miley's sibling.

Finally, father argues that none of the domestic violence incidents discussed in the record support jurisdiction of Miley because none of them occurred after Miley was born on January 27, 2013. Mother and father had separated, and father subsequently filed a petition for dissolution of marriage. Thus, father argues, there is no substantial risk that Miley will be exposed to domestic violence between the parents.

Father argues for an interpretation of the evidence which is favorable to him. However, we are bound to resolve all conflicts in the evidence, and make all reasonable inferences from the evidence, in support of the court's orders. (*Savannah M., supra*, 131 Cal.App.4th at p. 1393.) Evidence that the juvenile court sustained allegations of domestic violence between mother and father which put R. at risk of harm; that R. was ultimately placed with her father and removed from mother's custody; that father and mother continued to engage in violent physical altercations even after their separation; and that mother and father failed to complete domestic violence counseling is sufficient to support the juvenile court's conclusion that a substantial risk to Miley remained. Furthermore, the interviews with father showed a failure on father's part to take responsibility for his actions. Instead, he minimized the severity of the domestic violence which has taken place between the parents. For example, while he admitted being arrested for domestic violence, he stated that his offense was "not really hitting" mother.

physical altercation took place in R.'s presence. However, the fact that the incident was not specifically mentioned in the petition does not prevent the juvenile court from considering the event in determining whether Miley is at current risk of harm. Pursuant to section 300, subdivision (j), the juvenile court may consider "any . . . factors the court considers probative in determining whether there is a substantial risk to the child."

17

A parent's denial is a relevant factor in determining whether the parent is likely to modify his behavior. (*In re Esmerelda B.* (1992) 11 Cal.App.4th 1036, 1044.) Under the circumstances, the totality of the evidence before the juvenile court supported the finding of substantial risk of harm to Miley under section 300, subdivision (j).

## IV. Substantial evidence supported removal from father

Father also challenges the court's decision not to place Miley with father. Initially, the juvenile court indicated that its decision was to remove Miley from the custody of both parents pursuant to section 361. Then, upon learning that Miley had been taken from the hospital where she was born, the juvenile court stated, "So this is removal from the mother." To the extent the removal was from mother only, the parties argue, the appropriate statute for the court to consider in regards to custody for father was section 361.2, which provides for placement with the noncustodial parent. However, the record indicates that the court removed Miley from her parents' custody pursuant to section 361. Father argues that no substantial evidence supported removal from father under either statute.

To the extent that the juvenile court relied on the wrong statute, i.e., section 361 rather than 361.2, we find this to be harmless error. Section 361, subdivision (c)(1) requires a stricter standard for removal from parental custody. Specifically, it requires a finding by clear and convincing evidence of a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if the child is returned home. (§ 361, subd. (c)(1).) Section 361.2 permits placement with a noncustodial parent unless there is a finding by clear and convincing evidence that such placement would be detrimental to the safety, protection, or physical or emotional well-being of the child. (§ 361.2, subd. (a).) Thus, if the juvenile court relied on the substantial danger standard found in section 361, such finding necessarily encompassed a finding of detriment to the child as required by section 361.2.[7]

---

[7]    DCFS agrees that the appropriate statute for the juvenile court's decision not to place Miley with father was section 361.2. However, DCFS argues that father forfeited his rights under this statute due to his failure to affirmatively request custody of Miley.

Substantial evidence supported the juvenile court's findings under either the standard set forth in section 361, subdivision (c)(1) or the standard set forth in section 361.2, subdivision (a). The evidence before the court included evidence that Miley's older sibling had been subjected to domestic violence between father and mother and removed from their home for that reason. It showed failure on father's part to complete a domestic violence program ordered by the court, and continued domestic violence between the two parents even after they had separated. This evidence supported the juvenile court's decision not to place Miley in father's custody.

---

As DCFS points out, the relevant language of section 361.2 reads: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. *If that parent requests custody*, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a), italics added.)

We note that father did request custody of Miley in court at the detention hearing on February 1, 2013. However, DCFS is correct that at the time of the dispositional hearing, father did not make an affirmative request for custody of Miley, he merely sought unmonitored visits. We find that we need not address the question of whether father's initial request is sufficient to prevent forfeiture of a custody request under section 361.2. As set forth above, a finding of detriment to the child under section 361.2 was necessarily encompassed within the juvenile court's finding that a substantial danger to Miley existed if she were released to the custody of either parent. The juvenile court made findings sufficient to support its dispositional order under either statute.

However, to the extent that father complains that the juvenile court did not make findings either in writing or on the record pursuant to the mandate in section 361.2, subdivision (c), we find that father forfeited this issue on appeal by failing to raise section 361.2, or its requirement that the court set forth specific findings, at the time of the dispositional hearing.

19

**DISPOSITION**

The orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST